UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LYTAL ENTERPRISES, INC.                    CIVIL ACTION


VERSUS                                     NO: 06-0033


NEWFIELD EXPLORATION CO.                   SECTION: R(2)


### ORDER AND REASONS

Before the Court is Lytal's motion for summary judgment on unpaid invoices.  For the following reasons, the Court GRANTS the motion.


## I.  Background

### A.  Factual Background

This case arises out of a charter agreement between Lytal Enterprises, Inc. and Newfield Exploration Co.  On March 19, 2001, Lytal and Newfield entered into a Blanket Time Charter agreement in which Lytal agreed to provide vessels to Newfield for use in exploration and production of mineral resources in the

Gulf of Mexico.  Under the agreement, Newfield would request bids from Lytal for specific boats to meet its specific operational requirements.

On December 7, 2004, the parties entered into a letter agreement for Lytal to provide the *M/V Lytal Andre*.  The agreement, which was to terminate on December 6, 2005, incorporated the terms of the 2001 agreement and set a day rate of $2,775.00 for the charter.  On March 24, 2005, the parties entered into a similar agreement for the *M/V Lytal Regan*, to terminate on March 21, 2006, at a day rate of $2,875.00.  On April 11, 2005, the parties entered into another agreement for the *M/V Lytal Ashley*, to terminate on April 11, 2006, at a day rate of $2,875.00.  According to Newfield, the letter agreements each altered item 23 of the Blanket Time Charter to prevent either party from terminating the charters before the expiration of the respective one-year terms.

In late July 2005, the president of Lytal, James T. Lytal, died.  Shortly before this occurred, Joseph Murphy became president of Lytal.  At some point over the next few months, Murphy began negotiating to sell the assets of Lytal, including the boats under charter to Newfield.  (R. Doc. 71-4 at pp. 23-24).  On August 29, 2005, Hurricane Katrina struck the Gulf Coast, causing widespread damage to offshore operations.  Because

2

of a sudden scarcity of utility boats, day rates in the Gulf of Mexico began to rise.  On September 24, 2005, Hurricane Rita struck the Gulf Coast, causing further increases in utility boat day rates.  As a result of the two hurricanes, the agreement between Lytal and Newfield became relatively more favorable to Newfield and less favorable to Lytal because Lytal might otherwise have received the new, higher rates.

On September 22, 2005, Murphy wrote to Glen Duplantis of Newfield complaining that Newfield's use of Lytal deckhands in cargo loading operations and the "hours the vessels are being forced to work" constituted unsafe working conditions and a material breach of the original blanket time charter.  (R. Doc. 71-21).  Murphy further stated that it was Lytal's intention to terminate the blanket charter agreement 30 days after Newfield's receipt of the letter.  *Id.*  Lytal had complained to Newfield about safety issues three months earlier.  (R. Doc. 61-3 at Ex. D).

In October 2005, Lytal attempted to renegotiate the contract with Newfield.  In particular, Lytal sought more favorable indemnification terms from Newfield.  (R. Doc. 71-4 at p. 35).  When the parties could not agree on new terms, Newfield alleges that Lytal began to complain of safety concerns that it had never previously voiced.

On December 6, 2005, while the *Ashley* was attempting to off-load cargo in rough seas, a wave washed over the deck, allegedly putting deckhands and cargo in danger.  (R. Doc. 61-3 at Ex. H). Lytal now argues that this would not have happened had Glen Duplantis of Newfield used an alternate off-loading position. (R. Doc. 61-3 at Ex. C, pp. 152-53).

On December 11, 2005, the captain of the *Regan* decided to bring his vessel back to shore because of impending bad weather. After this decision, Newfield questioned the captain's motives and threatened not to pay Lytal if the captain brought the vessel to shore.  (R. Doc. 61-3 at Ex. E, pp. 113-16).

On December 14, 2005, Murphy notified Newfield that Lytal would withdraw the *M/V Lytal Regan* and *M/V Lytal Ashley* from service for Newfield within 72 hours.  (R. Doc. 71-22).  Murphy stated that Newfield was in material breach of the blanket time charter agreement for two reasons: (1) Newfield instructed Lytal captains to perform unsafe acts in violation of the charter agreement; and (2) Newfield failed to pay Lytal timely under the charter agreements.  *Id.*

On December 19, 2005, Newfield confirmed that, on December 17, 2005, Lytal removed the two boats from service to Newfield and stated that Newfield viewed this action as a material breach of Lytal's contract with Newfield.  (R. Doc. 71-23).

4

During the course of the relationship between Lytal and Newfield, Lytal issued invoices to Newfield related to the chartering of the *Ashley*, *Andre* and *Regan*.  These invoices, dated in October, November and December 2005, total $482,132.46.  (R. Doc. 46-2 at p.3).  The parties agree that Newfield never paid the amounts listed in the invoices.  (R. Doc. 76-2).

**B.  Procedural History**

On December 15, 2005, Lytal sued Newfield in state court, seeking $178,390.00 in damages for breach of contract and a declaratory judgment declaring the blanket time charter agreement between the parties terminated.  Newfield counterclaimed seeking $115,000.00 for breach of contract for Lytal's failure to furnish replacement vessels while its three boats were out of service, $886,000.00 for breach of contract for Lytal's removal of the *Regan* and *Ashley* from service before the termination of the corresponding letter agreements, and $75,000 for the negligence of Lytal's crew and/or unseaworthiness of the *Regan* resulting in damage to a Newfield platform in the Gulf of Mexico.  In a later amended complaint, Lytal increased its demand for damages to $482,116.46 and sought the release of liens filed by Newfield against the *Ashley*, the *Regan* and the *Andre*.  Lytal also prayed for attorneys' fees, a claim that it later conceded should be

5

dismissed.  (R. Doc. 72-1 at p. 8).  Lytal no longer pursues the declaratory judgment because the parties agree that the blanket time charter agreement has been terminated.  In addition, Lytal's maritime liens claim is mooted by the release of the liens in question.  Lytal's remaining claim is for breach of contract. Newfield has claims for (1) breach of contract arising from Lytal's failure to furnish replacement vessels; (2) breach of contract arising from Lytal's withdrawal of its vessels; and (3) the negligence and/or unseaworthiness of Lytal's vessel that damaged Newfield's platform.

On August 11, 2006, Lytal moved for summary judgment on the unpaid invoices, asserting that there was no genuine issue of material fact as to whether Newfield owed the amount cited in the invoices.  On August 22, 2006, Lytal moved for partial summary judgment on Newfield's counterclaims for breach of the blanket time charter agreement between the parties.  On August 30, 2006, Newfield moved for summary judgment as to all of Lytal's claims, and moved for partial summary judgment on liability as to all of its own (Newfield's) counterclaims.  This opinion addresses only Lytal's claims for unpaid invoices.

## II.  LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish that a genuine issue exists for trial.  *See Id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

The Fifth Circuit has held that courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

III.  **DISCUSSION**

    **A.  Legal Standard – Maritime Contract**

    As a preliminary matter, it is well-established that a charter agreement is a maritime contract.  *See Morewood v. Enequist*, 64 U.S. 491 (1860); *see also Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 572 (2d Cir. 2005).  Courts typically employ federal common law to resolve maritime disputes.  *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991).  The Fifth Circuit has looked to "general rules of contract law" in interpreting charter agreements such as the one in this case. *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1234 (5th Cir. 1986).  The *Marine Overseas* Court noted that "since most points of charter law involve construction of the charter, the principles are much the same as those of ordinary contract law."  *Id.* (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 at 196 (2d ed. 1975)).  The Court then

looked to the Restatement (Second) of Contracts for general principles of contract law. *Id.*

In *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961), the Supreme Court indicated that state law can apply to maritime contractual disputes in certain circumstances, although the Court applied federal law to the maritime contract before the Court. *Id.* (holding that an oral contract in which a seaman agreed to seek inexpensive medical care in exchange for a promise by the shipowner to compensate him for any adverse consequences was a maritime contract and that the state's interest in applying the statute of frauds was insufficient to overcome the customary application of maritime law). The Fifth Circuit has recognized that state law may apply under *Kossick* to maritime contracts and held state law applicable to marine insurance contracts. *See, e.g., 5801 Associates, Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 665 & n.8 (5th Cir. 1993) (noting that "it was better to rely on general common law instead of state law" when faced with a "non-insurance scenario.") (citation omitted). The Court notes that the present matter does not involve marine insurance. Further, the Court has not found, and the parties have not furnished, any Fifth Circuit cases that applied state law to maritime contracts outside of the marine insurance context. Given the clarity of the applicable authority in *Marine Overseas*,

9

and the absence of Fifth Circuit jurisprudence applying state law
to charter party agreements, the Court will not further address
the potential application of state law.  Accordingly, the Court
will apply federal maritime law when it provides the rule of
decision; in the absence of applicable federal maritime
precedent, the Court will look to ordinary federal common law and
the general principles of contract law as expressed by the
Restatement (Second) of Contracts, rather than any particular
state's law.  This approach promotes uniformity in the
application of federal maritime law and avoids costly choice-of-
law litigation.[1]

### B.  Analysis

    The parties do not contest that the total amount of the
invoices is $482,133.46 and that Lytal provided the vessels
listed on the given dates.  (R. Doc. 76-2).  The issue is whether
Lytal committed a material breach of the agreement on December
17, 2005 that relieves Newfield of the obligation to pay the
invoices.  Newfield argues that Lytal's actions constitute a
material breach of the contract, thereby excusing any further

---

    [1] In their briefs, the parties rely extensively on general
principles of contract law and federal common law.  They cite
scant authority for their propositions in the actual maritime
context.

performance by Newfield.  Newfield further argues that the
obligation to pay the invoices had not ripened at the time of the
alleged material breach, because payment of the invoices was not
yet due under the contract or under the course of dealings
between the parties.

In support of its contention, Newfield cites two cases.  The
first is *Todd Shipyards Corp. v. Turbine Service, Inc.*, 467
F.Supp. 1257, 1306 (D.C. La. 1978).  In that case, the district
court stated in a footnote that one party to a contract was
"excused from performance by the material breach of" another
party.  *Id.* at 1306 n.32.  The court continued, however, that
"since [the] breach has discharged [the non-breaching party's]
duty to pay the contract price, the balance owing [the breaching
party] is deducted from the damages that would otherwise be
recoverable . . . .  In the end, this is equivalent to forcing
both parties to perform their parts of the bargain."  *Id.*

Newfield also cites *Motiva Enterprises, L.L.C. v. St. Paul
Fire and Marine Ins. Co.*, 445 F.3d 381 (5th Cir. 2006).  In that
case, the Court of Appeals considered a situation in which an
insured settled a case without obtaining the insurer's consent
under a consent-to-settle clause.  *Id.* at 383.  The Court found
that, under Texas law, the failure to obtain consent constituted
a material breach of the insurance contract, thereby relieving

11

the insurance company of the obligation to pay the settlement. *Id.* at 386-87.

Newfield further cites the Restatement (Second) of Contracts § 253.  The restatement, in pertinent part, reads as follows:

> (2) Where performances are to be exchanged under an exchange of promises, one party's repudiations of a duty to render performance discharges the other party's remaining duties to render performance.

*Id.*  According to Newfield, Lytal's repudiation of its promise to provide vessels after December 17, 2005 excuses Newfield from its obligation to pay for vessels it used before that date under the contract.

Even if the Court assumes that Lytal's withdrawal of its vessels was a material breach, Newfield's analysis is flawed. The *Todd Shipyards* case provides that the amount owed to the breaching party under the contract is deducted from the damages owed to the non-breaching party.  Extrapolating from this conclusion, if the amount owed to the non-breaching party is less than the amount owed to the breaching party, than the difference would be recoverable by the breaching party in damages.  This amounts to "forcing both parties to perform their parts of the bargain."  When Newfield seeks prospective damages for Lytal's allegedly unjustified withdrawal of the vessels from service, it must offset the total amount it paid to replace the boats against

12

the amount it would have paid had the contract been performed. This would give Newfield the "benefit of the bargain" that it reached with Lytal. But under Newfield's framework, a material breach on December 17, 2005 would relieve Newfield of the obligation to pay for the previous months of usage. Such a windfall constitutes far more than the benefit of the bargain.

Reliance on the *Motiva Enterprises* case is similarly misplaced. In that case, settlement without consent frustrated the purpose of the consent-to-settlement provision. Had the court not discharged the insurer's obligations, then the consent-to-settlement clause would have been rendered meaningless. It cannot similarly be argued that an alleged material breach of the agreements between the parties on December 17, 2005 defeated the satisfaction of the parties' promises before that date.[2]

Although the Court can find no directly-applicable precedent in the maritime context, the proper disposition of this case is

------

[2] The following example illustrates the flaws in Newfield's reasoning: A and B enter into a contract whereby A agrees to pay B an daily rate for services on a fixed number of days over a one-year term. Payment is due at the end of the term. The parties perform under the contract until, 320 days into the contract, B materially breaches the agreement. Under Newfield's argument, A is entitled to contract damages for the remaining 45 days on the contract, and B is entitled to nothing. Alternatively, Newfield argues that B is entitled only to set off its losses against the amount owed to A, and any excess amount is not recoverable. Theoretically, if A never sued, B could never recover for its performance.

addressed in the Restatement (Second) of Contracts § 240 (1981), which deals with severable or divisible obligations as follows:

> If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.

*Id.* As the commentary explains, "[i]f there is an uncured material failure by either party, he can claim compensation for any parts that he has already performed, but he cannot enforce the contract with respect to any other pair of corresponding parts, including the part or parts that he has failed to perform." *Id.* cmt. b.  Under this doctrine, a court may require compensation for part performance if the previous performance can be severed from the remaining obligations.

In this case, it is clear that the obligations under the blanket time charter and letter agreements are divisible.  The obligation to pay arose only as the boats were used, so that each day's use by Newfield triggered a corresponding obligation to pay the day rate to Lytal.  Payment was made periodically, in accordance with invoices that stated the day-rate and usage. Consequently, the Court finds that the agreements between Lytal and Newfield were divisible agreements.

14

Given that each day of use by Newfield corresponds to a promise to pay, Lytal's performance until December 17, 2005 entitles it to compensation for that performance. *See* Restatement (Second) of Contracts § 240 cmt. b, illus. 1-2. That compensation must be made for part performance in this context is well-established in the federal common law of contracts, as well as the general principles of contract law. *See Fusion Inc. v. Nebraska Aluminum Castings, Inc.*, 1997 WL 51227, *21-22 (D. Kan. 1997) (holding that material breach did not excuse opposing party's payment for commissions already earned); *see also Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989) (holding that obligations arising on a year-by-year basis out of a single contract may be considered separately); *Habib v. Raytheon Co.*, 616 F.2d 1204, 1208 (D.C. Cir. 1980) (holding that independent obligations may be divisible under a single contract for purposes of calculating a statute of limitations); Restatement (Second) of Contracts § 240; 14 Williston on Contracts § 43:8 (4th ed.). Accordingly, there is no genuine issue of material fact as to whether Newfield owes Lytal $482,112.46[3] under the blanket time charter and letter

---

[3] The invoices provided by Lytal actually total $482,132.46, but Lytal demands only $482,112.46 in its Amended Complaint.

agreements between the parties, Lytal is entitled to summary judgment.

## IV.  SET-OFF

Newfield argues, alternatively, that it has a set-off right as a defense to payment.  Newfield has cited no authority for the proposition that it may assert its own claims for damages as a defense to its obligation to pay for the vessels provided.  By comparison, when the United States asserts its right to set-off in maritime cases, it does so under 31 U.S.C. §§ 3727-28.  *See Hornbeck Offshore Operators, Inc. v. Ocean Line of Bermuda*, 849 F.Supp. 434, 440-41 (4th Cir. 1994).  Newfield has not demonstrated that it is entitled to a statutory defense of set-off.  Nor is there a right of set-off specified in the contract. Further, Newfield has not established the existence of a common law right to set-off as a defense to the payment of divisible obligations in the maritime context.  In the absence of statutory, contractual or case law authority establishing a set-off defense in this context, the Court holds that Newfield's claims are not a defense to its divisible obligation to pay the invoices at issue.

16

**V.   CONCLUSION**

For the foregoing reasons, the Court GRANTS Lytal's motion for summary judgment on unpaid invoices.


New Orleans, Louisiana, this  18th  day of October, 2006.


SARAH S. VANCE
UNITED STATES DISTRICT JUDGE