```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

LYTAL ENTERPRISES, INC.                       CIVIL ACTION


VERSUS                                        NO: 06-0033


NEWFIELD EXPLORATION CO.                      SECTION: R(2)
```

## ORDER AND REASONS

Before the Court are Lytal's motion for partial summary judgment and Newfield's motion for summary judgment.  For the following reasons, the motions before the Court are DENIED.

**I. Background**

    **A. Factual Background**

This case arises out of a charter agreement between Lytal Enterprises, Inc. and Newfield Exploration Co.  On March 19, 2001, Lytal and Newfield entered into a Blanket Time Charter agreement in which Lytal agreed to provide vessels to Newfield for use in exploration and production of mineral resources in the

Gulf of Mexico.  Under the agreement, Newfield would request bids from Lytal for specific boats to meet its specific operational requirements.

On December 7, 2004, the parties entered into a letter agreement for Lytal to provide the *M/V Lytal Andre*.  The agreement, which was to terminate on December 6, 2005, incorporated the terms of the 2001 agreement and set a day rate of $2,775.00 for the charter.  On March 24, 2005, the parties entered into a similar agreement for the *M/V Lytal Regan*, to terminate on March 21, 2006, at a day rate of $2,875.00.  On April 11, 2005, the parties entered into another agreement for the *M/V Lytal Ashley*, to terminate on April 11, 2006, at a day rate of $2,875.00.  According to Newfield, the letter agreements each altered item 23 of the Blanket Time Charter to prevent either party from terminating the charters before the expiration of the respective one-year terms.

In late July 2005, the president of Lytal, James T. Lytal, died.  Shortly before this occurred, Joseph Murphy became president of Lytal.  At some point over the next few months, Murphy began negotiating to sell the assets of Lytal, including the boats under charter to Newfield.  (R. Doc. 71-4 at pp. 23-24).  On August 29, 2005, Hurricane Katrina struck the Gulf Coast, causing widespread damage to offshore operations.  Because

of a sudden scarcity of utility boats, day rates in the Gulf of Mexico began to rise.  On September 24, 2005, Hurricane Rita struck the Gulf Coast, causing further increases in utility boat day rates.  As a result of the two hurricanes, the agreement between Lytal and Newfield became relatively more favorable to Newfield and less favorable to Lytal because Lytal might otherwise have received the new, higher rates.

On September 22, 2005, Murphy wrote to Glen Duplantis of Newfield complaining that Newfield's use of Lytal deckhands in cargo loading operations and the "hours the vessels are being forced to work" constituted unsafe working conditions and a material breach of the original blanket time charter.  (R. Doc. 71-21).  Murphy further stated that it was Lytal's intention to terminate the blanket charter agreement 30 days after Newfield's receipt of the letter.  *Id.*  Lytal had complained to Newfield about safety issues three months earlier.  (R. Doc. 61-3 at Ex. D).

In October 2005, Lytal attempted to renegotiate the contract with Newfield.  In particular, Lytal sought more favorable indemnification terms from Newfield.  (R. Doc. 71-4 at p. 35).  When the parties could not agree on new terms, Newfield alleges that Lytal began to complain of safety concerns that it had never previously voiced.

On December 6, 2005, while the *Ashley* was attempting to off-load cargo in rough seas, a wave washed over the deck, allegedly putting deckhands and cargo in danger. (R. Doc. 61-3 at Ex. H). Lytal now argues that this would not have happened had Glen Duplantis of Newfield used an alternate off-loading position. (R. Doc. 61-3 at Ex. C, pp. 152-53).

On December 11, 2005, the captain of the *Regan* decided to bring his vessel back to shore because of impending bad weather. After this decision, Newfield questioned the captain's motives and threatened not to pay Lytal if the captain brought the vessel to shore. (R. Doc. 61-3 at Ex. E, pp. 113-16).

On December 14, 2005, Murphy notified Newfield that Lytal would withdraw the *M/V Lytal Regan* and *M/V Lytal Ashley* from service for Newfield within 72 hours. (R. Doc. 71-22). Murphy stated that Newfield was in material breach of the blanket time charter agreement for two reasons: (1) Newfield instructed Lytal captains to perform unsafe acts in violation of the charter agreement; and (2) Newfield failed to pay Lytal timely under the charter agreements. *Id.*

On December 19, 2005, Newfield confirmed that, on December 17, 2005, Lytal removed the two boats from service to Newfield and stated that Newfield viewed this action as a material breach of Lytal's contract with Newfield. (R. Doc. 71-23).

During the course of the relationship between Lytal and Newfield, Lytal issued invoices to Newfield related to the chartering of the *Ashley*, *Andre* and *Regan*.  These invoices, dated in October, November and December 2005, total $482,132.46.  (R. Doc. 46-2 at p.3).  The parties agree that Newfield never paid the amounts listed in the invoices.  (R. Doc. 76-2).

### B.  Procedural History

On December 15, 2005, Lytal sued Newfield in state court, seeking $178,390.00 in damages for breach of contract and a declaratory judgment declaring the blanket time charter agreement between the parties terminated.  Newfield counterclaimed seeking $115,000.00 for breach of contract for Lytal's failure to furnish replacement vessels while its three boats were out of service, $886,000.00 for breach of contract for Lytal's removal of the *Regan* and *Ashley* from service before the termination of the corresponding letter agreements, and $75,000 for the negligence of Lytal's crew and/or unseaworthiness of the *Regan* resulting in damage to a Newfield platform in the Gulf of Mexico.  In a later amended complaint, Lytal increased its demand for damages to $482,116.46 and sought the release of liens filed by Newfield against the *Ashley*, the *Regan* and the *Andre*.  Lytal also prayed for attorneys' fees, a claim that it later conceded should be

dismissed.  (R. Doc. 72-1 at p. 8).  Lytal no longer pursues the declaratory judgment because the parties agree that the blanket time charter agreement has been terminated.  In addition, Lytal's maritime liens claim is mooted by the release of the liens in question.  Lytal's remaining claim is for breach of contract.  Newfield has claims for (1) breach of contract arising from Lytal's failure to furnish replacement vessels; (2) breach of contract arising from Lytal's withdrawal of its vessels; and (3) the negligence and/or unseaworthiness of Lytal's vessel that damaged Newfield's platform.

On August 11, 2006, Lytal moved for summary judgment on the unpaid invoices, asserting that there was no genuine issue of material fact as to whether Newfield owed the amount cited in the invoices.  On August 22, 2006, Lytal moved for partial summary judgment on Newfield's counterclaims for breach of the blanket time charter agreement between the parties.  On August 30, 2006, Newfield moved for summary judgment as to all of Lytal's claims, and moved for partial summary judgment on liability as to all of its own (Newfield's) counterclaims.  This opinion addresses Lytal's motion for partial summary judgment on Newfield's counterclaims and Newfield's motion for summary judgment.

**II.   LEGAL STANDARD – SUMMARY JUDGMENT**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish that a genuine issue exists for trial.  *See Id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

The Fifth Circuit has held that courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

### III. DISCUSSION

#### A. Legal Standard – Maritime Contract

As a preliminary matter, it is well-established that a charter agreement is a maritime contract. *See Morewood v. Enequist*, 64 U.S. 491 (1860); *see also Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 572 (2d Cir. 2005). Courts typically employ federal common law to resolve maritime disputes. *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991). The Fifth Circuit has looked to "general rules of contract law" in interpreting charter agreements such as the one in this case. *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1234 (5th Cir. 1986). The *Marine Overseas* Court noted that "since most points of charter law involve construction of the charter, the principles are much the same as those of ordinary contract law." *Id.* (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 at 196 (2d ed. 1975)). The Court then

looked to the Restatement (Second) of Contracts for general principles of contract law.  *Id.*

In *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961), the Supreme Court indicated that state law can apply to maritime contractual disputes in certain circumstances, although the Court applied federal law to the maritime contract before the Court. *Id.* (holding that an oral contract in which a seaman agreed to seek inexpensive medical care in exchange for a promise by the shipowner to compensate him for any adverse consequences was a maritime contract and that the state's interest in applying the statute of frauds was insufficient to overcome the customary application of maritime law).  The Fifth Circuit has recognized that state law may apply under *Kossick* to maritime contracts and held state law applicable to marine insurance contracts.  *See, e.g., 5801 Associates, Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 665 & n.8 (5th Cir. 1993) (noting that "it was better to rely on general common law instead of state law" when faced with a "non-insurance scenario.") (citation omitted).  The Court notes that the present matter does not involve marine insurance. Further, the Court has not found, and the parties have not furnished, any Fifth Circuit cases that applied state law to maritime contracts outside of the marine insurance context. Given the clarity of the applicable authority in *Marine Overseas*,

and the absence of Fifth Circuit jurisprudence applying state law to charter party agreements, the Court will not further address the potential application of state law. Accordingly, the Court will apply federal maritime law when it provides the rule of decision; in the absence of applicable federal maritime precedent, the Court will look to ordinary federal common law and the general principles of contract law as expressed by the Restatement (Second) of Contracts, rather than any particular state's law. This approach promotes uniformity in the application of federal maritime law and avoids costly choice-of-law litigation.[1]

Courts interpret maritime contracts, as they do other contracts, by looking first to the intent of the parties as expressed by the terms of the agreement. *See, e.g., Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) (re-affirming that courts should look first to the expressed intent of the parties when interpreting indemnity clauses); see also 22 Williston on Contracts § 58:9 (4th ed.). A maritime contract "should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of

---

[1] In their briefs, the parties rely extensively on general principles of contract law and federal common law. They cite scant authority for their propositions in the actual maritime context.

the parties unless the disputed language is ambiguous."
*Fontenot*, 791 F.2d at 1214.  If the language of the contract is
ambiguous, a court may consider extrinsic evidence to determine
the intention of the parties at the time of contract.  *Atlantic
Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 730 (5th Cir. 1975).

### B. Early Withdrawal of the Vessels

Lytal argues that summary judgment is appropriate on
Newfield's two breach of contract claims because Lytal's
termination of the blanket time charter agreement was justified.
Newfield also moves for summary judgment, arguing that it did not
materially breach the contract and that Lytal's cancellation
itself constituted breach of contract.

Lytal argues that it was justified in terminating the
blanket time charter agreement as indicated in its December 14,
2005 letter.  Lytal contends that Newfield's disregard for the
safety of Lytal vessels and crewmembers and Newfield's failure to
make timely payment on Lytal's invoices constitutes a material
breach of the blanket time charter agreement.  Lytal further
argues that Newfield suffered no injury as a result of the
cancellation of the contract because it did not hire any
substitute vessels.  Newfield argues that Lytal's safety and
invoice concerns do not rise to the level of breach of contract,

11

and that Lytal was therefore obligated to continue performance under the contract.

The Court has reviewed the parties' submissions and has determined that a genuine issue of material fact exists as to whether Lytal's termination of the blanket time charter agreement was justified under the terms of the charter.  The blanket time charter is ambiguous as to whether early termination is allowed for safety concerns.  The intent of the parties at the time of contracting is at issue.  Further, the facts are in dispute as to whether the safety concerns were real or baseless.  The facts are in dispute as to course of dealing between the parties. Accordingly, the Court finds that a genuine issue of material fact as to Newfield's claim for early withdrawal of the vessels.

### C.  Failure to Provide Substitute Vessels

Lytal contends that it is entitled to summary judgment on this claim because the contract does not require Lytal to provide substitute vessels and Newfield does not have a right under the blanket time charter to seek damages when Lytal's vessels were out of service.  Newfield argues that the letter agreement supersedes the blanket time charter and requires Lytal to provide a substitute vessel whenever its boats are out of service.

The Court has determined that there is a genuine issue of material fact as to this claim. For example, the agreements are ambiguous as to whether the parties intended for Lytal to have an obligation to provide substitute vessels. Thus, the parties' intent is at issue. In addition, there are factual issues concerning how the parties dealt with this issue during their course of dealing. Accordingly, the Court finds that a genuine issue of material fact exists as to this claim.

### D.   Indemnification Claim

Newfield argues that it is entitled to summary judgment on this claim because it is undisputed that the *M/V Lytal Regan* allided with Newfield's platform in the Gulf of Mexico. The Court has determined that the underlying facts concerning the allision are in dispute.

### V.   CONCLUSION

For the foregoing reasons, the Court DENIES Lytal's motion for partial summary judgment. Further, the Court DENIES Newfield's motion for summary judgment.

New Orleans, Louisiana, this __25th__ day of October, 2006.


_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE