UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


LYTAL ENTERPRISES, INC.                    CIVIL ACTION


VERSUS                                     NO: 06-0033


NEWFIELD EXPLORATION CO.                   SECTION: R(2)



**ORDER AND REASONS**

     Before the Court is Lytal's renewed motion for judgment as a
matter of law or, in the alternative, a new trial.  For the
following reasons, the Court DENIES the motion for judgment as a
matter of law.  The motion for a new trial is DENIED IN PART and
GRANTED IN PART, unless Newfield agrees to accept a remittitur of
the judgment in accordance with this opinion.


**I.  Background**

   **A.  Procedural History**

     On December 15, 2005, Lytal Enterprises, Inc. sued Newfield
Exploration Co. in state court for breach of contract.  Newfield

counterclaimed, alleging that Lytal itself committed two breaches of contract and failed to indemnify Newfield for damage to its platform caused by a Lytal vessel.  On October 18, 2006, the Court granted Lytal's motion for summary judgment on its breach of contract claim against Newfield.  On October 23-25, 2006, the Court held a trial on Newfield's claims for breach of contract and for indemnification.  At the close of Newfield's evidence, and at the close of all of the evidence, the Court denied Lytal's motions for judgment as a matter of law.  The Court also denied Newfield's motion for judgment as a matter of law as to its breach of contract claims, and the Court granted Newfield's motion for judgment as a matter of law, as to liability only, on Newfield's claim for contractual indemnification.  The jury returned a verdict in favor of Newfield on the two breach of contract claims.  The jury awarded Newfield $231,675.00 for Lytal's failure to provide substitute vessels while its boats were out of service; $600,875.00 for Lytal's withdrawal of its vessels from Newfield's service before the expiration of the applicable charter agreements; and $44,984.41 for Lytal's failure to indemnify Newfield for damage to its platform.  Lytal now moves for judgment as a matter of law under Fed. R. Civ. P. 50, or, in the alternative, for a new trial under Fed. R. Civ. P. 59.

**B.   Factual Background**

This case arose out of a charter agreement between Lytal and Newfield.  On March 19, 2001, Lytal and Newfield entered into a Blanket Time Charter agreement in which Lytal agreed to provide vessels to Newfield for use in exploration and production of mineral resources in the Gulf of Mexico.  Under the agreement, Newfield would request bids from Lytal for specific vessels to meet its operational requirements.

On December 7, 2004, the parties entered into a letter agreement for Lytal to provide the *M/V Lytal Andre*.  The agreement, which was to terminate on December 6, 2005, incorporated the terms of the Blanket Time Charter and set a day rate of $2,775.00.  On March 24, 2005, the parties entered into a similar agreement for the *M/V Lytal Regan*, to terminate on March 21, 2006, at a day rate of $2,875.00.  On April 11, 2005, the parties entered into another agreement for the *M/V Lytal Ashley*, to terminate on April 11, 2006, at a day rate of $2,875.00.  Although the Blanket Time Charter permitted the termination of the charter of any vessel before the expiration of the charter period provided that the terminating party gave seventy-two hours' written notice, the letter agreements for the specific vessels provided that neither party could unilaterally terminate the charter during the applicable one-year charter period.

3

In July 2005, the president of Lytal, James T. Lytal, died. Shortly before this occurred, Joseph Murphy became president of Lytal.  Over the next few months, Murphy began negotiating to sell the assets of Lytal, including the boats under charter to Newfield.  On August 29, 2005, Hurricane Katrina struck the Gulf Coast, causing widespread damage to offshore operations.  Because of a sudden scarcity of utility boats, day rates in the Gulf began to rise.  On September 24, 2005, Hurricane Rita struck the Gulf Coast, causing further destruction and further increases in utility boat day rates.  As a result of the two hurricanes, the agreement between Lytal and Newfield became relatively more favorable to Newfield and less favorable to Lytal because Lytal might otherwise have received the new, higher day-rates for its vessels.

On September 22, 2005, Murphy wrote to Glen Duplantis of Newfield complaining that Newfield's use of Lytal deckhands in cargo loading operations and the long working hours of the vessels constituted unsafe working conditions and a material breach of the Blanket Time Charter.  Murphy further stated that it was Lytal's intention to terminate the Blanket Time Charter 30 days after Newfield's receipt of the letter.  During the course of the letter agreements, Lytal had occasionally complained to Newfield about safety issues.  In October 2005, Lytal attempted

4

to renegotiate the charter agreement with Newfield, seeking more favorable indemnification terms.  The parties were unable to reach a new agreement.  Thereafter, Lytal's complaints about safety increased.

In early December 2005, a wave washed over the deck of the *Ashley* while it was off-loading cargo in rough seas.  Lytal argued at trial that the incident put its deckhands and cargo in danger.  Lytal also argued that the incident would not have occurred if Newfield had used an alternate off-loading position.  On December 11, 2005, the captain of the *Regan* decided to bring his vessel back to shore because of impending bad weather.  In a phone call to a Lytal representative, Newfield's base foreman questioned the captain's motives and threatened not to pay Lytal if the captain brought the vessel to shore.  On December 6, 2005, the charter agreement for the *Andre* terminated, leaving only the *Ashley* and *Regan* under charter to Newfield.

On December 14, 2005, Murphy notified Newfield that Lytal was withdrawing the *Regan* and the *Ashley* from service to Newfield within 72 hours.  Murphy stated that Newfield was in material breach of the Blanket Time Charter because Newfield instructed Lytal captains to perform unsafe acts, and Newfield failed to pay Lytal timely under the charter agreements.  On December 17, 2005, Lytal withdrew the vessels from Newfield's service.  As a result,

Newfield shifted other vessels under charter to take the place of the Lytal boats, delaying some other operations.  Newfield also chartered additional vessels that were tasked with the operations previously assigned to Lytal boats.

## II.  LEGAL STANDARDS

### A.  Judgment as a Matter of Law

The Court will grant judgment as a matter of law under Rule 50 only when the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a different verdict.  *Arsement v. Spinnaker Exploration Co., L.L.C.*, 400 F.3d 238, 248-49 (5th Cir. 2005). The Court will consider all of the evidence, and draw factual inferences in favor of the verdict.  *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003).  The Court, however, leaves credibility determinations, the weighing of the evidence, and the drawing of all legitimate inferences from the facts to the jury.  *Id*.  A mere scintilla of evidence, however, "'is insufficient to present a question for the jury'" as "'there must be a conflict in substantial evidence to create a jury question.'"  *Id*. (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997).  In addition, when a party fails to move timely for judgment as a matter of law on an issue, the

party waives that issue for purposes of judgment as a matter of law.  *See Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996).  At the close of all of the evidence, Lytal moved for judgment as a matter of law on the following grounds: (1) Newfield did not establish that it ever requested replacement vessels or suffer any damages as a result of Lytal's failure to provide replacement vessels; (2) the blanket time charter could be terminated with 30-days' notice that Lytal gave; and (3) Newfield suffered no damages upon Lytal's cancellation of the contract.  Lytal is therefore not entitled to judgment as a matter of law, based on the alleged insufficiency of the evidence, on any other ground.


**B.   New Trial**

Rule 59(a) provides that the Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. Proc. 59.  Therefore, the Court may grant a new trial if it finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.  *See Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985).  When a party moves for a new trial on evidentiary

7

grounds, the Court will not grant a new trial unless "the verdict is against the great weight of the evidence." *Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir. 1998).


### C.   Alter or Amend Judgment

The Court has considerable discretion to grant or to deny a motion to alter or amend the judgment under Rule 59(e).  *See Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).  The Court, however, must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all the facts."  *Id*. at 355. Courts in this district hold that a moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law.  *See Scordill v. Louisiana Ladder Group, L.L.C.*, NO. CIV. A. 02-2565, 2004 WL 1118302, at *3 (E.D. La. May 18, 2004).


## III.  DISCUSSION

### A.   Ambiguity of the Contract

8

Lytal's first contention is that the timing of the Court's determination that the contract at issue was ambiguous adversely affected Lytal's trial strategy.  Although the parties submitted the contract terms in cross-motions for summary judgment, Lytal contends, the Court did not issue its ruling that the contract terms were ambiguous until the last day of trial.  Thus, Lytal was unable to anticipate that the contract might be found ambiguous and instead directed its trial strategy at the theory that the contract terms were clear.  The determination of whether a maritime contract is ambiguous is a question of law for the Court.  *See Jimenez v. Peninsular & Oriental Steam Navigation Co.*, 974 F.2d 221, 223 (1st Cir. 1992) (citing *United States ex. rel. Eastern Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 779 (11th Cir. 1990); *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)) (citations omitted).

Lytal's argument is wholly devoid of merit.  The parties' competing interpretations of the contract were listed as contested issues of law and fact in the pretrial order.  (R. Doc. 111).  The Court informed the parties orally at the pretrial conference that it would deny their summary judgment motions because the contract was ambiguous.  Furthermore, Lytal submitted a jury charge on contractual ambiguity, one week before trial, on Monday, October 16, 2006, so that its argument that it was

9

surprised is disingenuous.  Lytal requested a jury instruction that "if there is any ambiguity in the contract it is construed against the drafting party, in this case Newfield."  (R. Doc. 173 at p. 20).  Thus, Lytal did in fact anticipate that the Court might find the contract to be ambiguous.  In addition, Lytal did not object to the Court's giving an instruction on ambiguity, it objected only because the Court did not give the charge that Lytal requested.  Although parol evidence is inadmissible to prove the intent of the parties when the terms of a contract are clear from the language of the contract itself, Lytal did not object on that basis when Newfield introduced testimony about the intent of the parties.  Lytal has not established that the Court's determination that the contract was ambiguous came as a surprise.  Thus, Lytal is not entitled to judgment as a matter of law or a new trial on this ground.

Lytal further contends that the Court erred in failing to instruct the jury that ambiguities in a contract should be construed against the drafter.  In its pretrial filings, Lytal requested the following instruction, in pertinent part:

> [I]f there is any ambiguity in the contract it is construed against the drafting party, in this case Newfield.

(R. Doc. 173 at p. 20).  This sentence came as part of a two-paragraph proposed instruction.  Lytal cited to three cases as

support for the entire instruction.  *Id.*  The first case,
*Chembulk Trading, LLC v. Chemex, Ltd.*, 393 F.3d 550, 555 n.6 (5th
Cir. 2004), stands for the proposition that the rule that a
contract is construed against the drafter is inapplicable when
the contract is not ambiguous.  This does not establish that a
contract is construed against the drafter when it is ambiguous,
it merely establishes that the lack of ambiguity renders the rule
inapplicable.  The case does not spell out when and under what
circumstances the rule is employed.  The *Chembulk* Court cites the
second case offered by Lytal, *Empire Fire & Marine Ins. Co. v.
Brantley Trucking, Inc.*, 220 F.3d 679, 681 (5th Cir. 2000), for
its proposition.  *Empire Fire* was an insurance case decided under
Texas law.  *Id.* ("Texas courts have further recognized that when
an ambiguity exists, the dispute is resolved against the drafter,
or in favor of providing coverage.") (citation omitted).  This
operates only to establish the effect of the rule as a matter of
Texas insurance law.  As the Court will discuss, *infra*, the rule
of construing ambiguous contracts against the drafting party has
special import in insurance cases, where the insured is likely to
be an unsophisticated consumer who is unfamiliar with the
niceties of contract language.  Thus, the cases cited by Lytal in
requesting the jury instruction on resolving ambiguity against
the drafter did not establish that maritime contract law required

11

the charge on the facts of this case.  The Court did not include Lytal's requested instruction in its proposed instructions under Rule 51(b) because Lytal failed to establish that the instruction represented the applicable substantive law by citing to relevant case law.  The Court overruled Lytal's objection to the exclusion of the instruction because the Court held that the rule did not apply when the contracting parties were each sophisticated parties.

It is ordinarily the duty of the parties to request specific jury instructions.  *See* Fed. R. Civ. P. 51(a).  Failure to request a specific jury instruction, or failure to object to an instruction given in error, results in waiver of the party's objection to the instruction.  Fed. R. Civ. P. 51(d)(1).  When a request for an instruction is made, "Rule 51 . . . does not demand that a submitted charge be technically perfect to alert the court to a need for a particular charge." *Bueno v. City of Donna*, 714 F.2d 484, 490 (5th Cir. 1983).  Nevertheless, a party asserting error in an instruction must demonstrate three things: (1) viewing the charge as a whole, the charge creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations"; (2) the error could have affected the outcome of the case; and (3) the proposed instruction offered to the trial court correctly stated the law.

12

*Taita Chem. Co., Ltd. v. Westlake Styrene, L.P.*, 351 F.3d 663,
667 (5th Cir. 2003).

In this case, Lytal's request for an instruction on
construing ambiguity against the drafter was not warranted under
the applicable law.  It is the duty of the parties to establish
to the Court's satisfaction that the substantive law is
accurately reflected in the requested instruction.  Instructions
accompanied by citations to inapposite case law do not assist the
Court in determining what the substantive law is.  Although
Lytal's request for an instruction was sufficient to direct the
Court's attention to the potential for an ambiguity instruction,
the question is whether the Court's failure to give the requested
instruction resulted in an incorrect statement of the substantive
law, and if so, whether that incorrect statement resulted in
prejudice to Lytal.  *See Ratliff v. City of Gainesville, Tex.*,
256 F.3d 355, 359-60 (5th Cir. 2001).

Lytal contends that, under general principles of contract
law, the sophisticated party exception to the rule of construing
ambiguity against the drafting party applies only when the
contract is the result of negotiation and modification.  *See,
e.g., Omega Healthcare Investors, Inc. v. Lantis Enterprises,
Inc.*, 256 F.3d 774, 776-77 (8th Cir. 2001) (citing *Regis Assocs.
v. Rank Hotels (Mgmt.) Ltd.*, 894 F.2d 193, 195-96 (6th Cir.

1990)) (citations omitted).  The Fifth Circuit, on the other
hand, has cited with approval the principle that "resolving
ambiguities against [the] drafter [has] little value when [the]
parties have relatively equal sophistication and bargaining
power."  *McDermott Int'l, Inc. v. Lloyd's Underwriters of London*,
944 F.2d 1199, 1207 (5th Cir. 1991) (citing *In re Delta America
RE Insurance Co.*, 900 F.2d 890, 892 n.4 (6th Cir. 1990)).  Other
courts have held that sophisticated parties are not entitled to
the protection of the ambiguity rule.  *See McAdams v. Mass.
Mutual Life Ins. Co.*, 391 F.3d 287, 300 (1st Cir. 2004) ("[T]he
canon is . . . a default rule that arguably has more force where
the parties differ in sophistication or where standard forms are
used (*e.g.*, insurance contracts).  In any event the canon has
little to do with actual intentions and should only be used, as a
last resort, if other aids to construction leave the case in
equipoise.") (quoting *Nat'l Tax Institute, Inc. v. Topnotch at
Stowe Resort & Spa*, 388 F.3d 15, 18-20 (1st Cir. 2004)); *see also
Morgan Stanley Group, Inc. v. New England Ins. Co.*, 225 F.3d 270,
275-76 (2d Cir. 2000) (applying New York law, Second Circuit
stated that when a Court concludes that a contract provision is
ambiguous, and extrinsic evidence does not clarify the intent of
the parties, "a court may apply other rules of contract
construction, including the" rule that ambiguities should be

14

construed against the drafter); *U.S. Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991) (noting that, under New York law, the rule is inapplicable to a contest between two insurance companies).  It is therefore not the case that, as a matter of general contract law, the sophisticated parties exception applies only when a contract is the subject of negotiation and modification.  Lytal was in the business of chartering its vessels, so that dealing with charter agreements could hardly have been foreign to it.  The parties had been doing business with each other under similar types of contract vehicles for nearly five years.  This was not a case where a sophisticated drafter imposed onerous terms on the non-drafting party through the use of esoteric or ambiguous language.  In addition, as the Court will discuss, *supra*, both parties had input into the terms of the contract.  Accordingly, the Court was not in error in finding that the parties were of equal sophistication and that the rule of construing ambiguity against the drafting party was inapplicable.

Further, it is clear that the doctrine of construing ambiguities against the drafting party is, as best, a last recourse when all other means of construction have failed.  The doctrine is outcome-determinative only when the evidence is inconclusive.  Omission of the ambiguity instruction is therefore

unlikely ever to constitute prejudicial error, except when one party is significantly more sophisticated, and there is no extrinsic evidence of intent.  It is a generally-accepted principle of the rule of construing ambiguous contract terms against the drafting party that, once the Court has determined that the contract is ambiguous, interpreting the agreement from the words of the contract and extrinsic evidence is a task for the trier of fact.  *See, e.g., Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005) (applying Mississippi law); *Bradley v. Western & Southern Financial Group*, 2005 WL 2709282 *5-6 (N.D. Ind. 2005) (applying Indiana law).  Thus, the interpretive principle behind construing ambiguous contracts against their drafters does not establish the meaning of the contract as a matter of law.  The jury is still charged with determining the intent of the parties, which the jury did in this case according to the evidence and the rules of construction given in the Court's instructions.  Newfield's Jim Zernell testified as to Newfield's intent in executing the clauses at issue in the letter agreements.  (Tr. Trans. at pp. 85-94).  Glen Duplantis's testimony was consistent with that of Zernell.  (Tr. Trans. at pp. 177-82).  Lytal did not offer countervailing evidence of the intent of the parties.  As such, drawing inferences in favor of the jury's verdict, construing the

16

contract against the drafter would not have affected the outcome of the case.

Finally, the letter agreements are actually bid documents, with categories such as "Length," "Horsepower," "Four (4) Man crew (Rigger Certified)," and "Ability to furnish A like replacement boat At the agreed contract rate for USCG Insp. Or downtime repairs (Yes/No)" down the left side and blanks down the right side. (Tr. Exs. 11, 12). Lytal personnel completed the bid documents by filling in the blanks. Information such as the length or deck load of the vessel, as well as the daily charter rate, which were all crucial elements in the agreements, were provided not by Newfield but by Lytal. It cannot therefore be said that Newfield imposed ambiguous terms upon Lytal – Lytal itself wrote "Yes" to indicate that its crews were rigger certified, and "Yes" to indicate that it could furnish replacement vessels. Thus, both parties had input into the terms of the contract. This fact further supports the conclusion that Lytal was not entitled to an ambiguity instruction.

For all of the foregoing reasons, Lytal is not entitled to judgment as a matter of law or a new trial on this ground.


**B.   Safety of the Crews**

17

Lytal argues that the evidence establishes that Newfield disregarded the safety of Lytal's vessels and crews, thus breaching its duty as a time charterer.  Lytal argues that Newfield's disregard for the safety of the vessels constituted a material breach of the contract, thereby excusing future performance.  Lytal further contends that the jury was confused as to whether the material breach excused future performance or was a separate claim for damages.  Lytal's assertion concerns only Newfield's second breach of contract claim regarding Lytal's withdrawal of its vessels from Newfield's service.

Lytal argued at trial that it did not breach its contract with Newfield because performance under the contract was excused by Newfield's prior material breach.  Prior material breach is a defense to a suit for breach of contract.  *See Todd Shipyards Corp. v. Turbine Service, Inc.*, 467 F.Supp. 1257, 1306 (D.C. La. 1978); *Motiva Enterprises, L.L.C. v. St. Paul Fire and Marine Ins. Co.*, 445 F.3d 381, 386 (5th Cir. 2006).  The Court instructed the jury that Lytal bore the burden of proving Newfield's prior material breach by a preponderance of the evidence.  Lytal argues that the evidence establishing Newfield's alleged material breach was so overwhelming that a reasonable juror could only have concluded that Newfield materially breached.

18

The Court finds that the weight of the evidence supports the jury's verdict.  Lytal argues that it offered unrebutted evidence that Newfield breached the contract by disregarding the safety of Lytal's vessels and crews.  In particular, Lytal argues that Newfield breached the contract by (1) requiring Lytal personnel to perform rigging duties; (2) requiring Lytal to run its vessels in unsafe conditions; (3) preventing Lytal from performing maintenance on its vessels by running the vessels nearly 24 hours a day; and (4) threatening to cancel the contract after a Lytal captain refused to perform an unsafe act.  Without objection, the Court instructed the jurors that a material breach is defined as follows:

> [T]HE FAILURE TO DO SOMETHING THAT IS SO FUNDAMENTAL
> TO THE CONTRACT THAT THE FAILURE TO PERFORM THAT
> OBLIGATION DEFEATS THE BASIC PURPOSE OF THE CONTRACT
> OR MAKES IT IMPOSSIBLE FOR THE OTHER PARTY TO PERFORM
> UNDER THE CONTRACT.

(R. Doc. 171 at p. 10); *see also* 23 Williston on Contracts § 63:3 (4th ed.).

Newfield offered evidence that its alleged breach of contract did not defeat the basic purpose of the contract or make it impossible for Lytal to perform.  Newfield's vice-president of production, Jim Zernell, testified that "the captain of the ship

is always responsible for his vessel.  If he thought that
something was unsafe, that would be up to his decision." (Tr.
Trans. at pp. 92-93).  Zernell testified that, in response to a
September 2005 complaint about Lytal personnel being forced to
perform rigging duties, Newfield agreed to provide its own
personnel for rigging purposes. *Id.* at pp. 100-01.  Zernell
further testified that he was never made aware of any written
notations by Lytal captains indicating that they had been asked
to perform unsafe acts. *Id.* at pp. 92-93.  The blanket time
charter expressly provided as follows:

> The vessel Master shall have the sole right to
> determine whether the voyage ordered by Charterer or
> Charterer's representative may be undertaken with
> safety to Owner's crew, to all persons on board, and
> to the vessel.  If Owner refuses to undertake a
> voyage ordered by Charterer, Owner shall furnish
> Charterer with a written report describing the
> circumstances which resulted in such decision.
> Notwithstanding any provision herein to the contrary,
> should a voyage be undertaken or continued at
> Charterer's demand over the express written objection
> of the Master, Charterer shall assume complete
> responsibility for any loss or damages resulting from
> the voyage so undertaken or continued.

(Tr. Ex. 8 at ¶ 8).  Newfield's base foreman, Glen Duplantis,
also testified about the safety concerns that were the basis for
Lytal's allegation of material breach.  (Tr. Trans. at pp. 192-
94).  Duplantis explained that Lytal had sent a letter to
Newfield in September 2005 declaring that Newfield was in breach

of the charter agreement because Lytal deckhands were being
forced to perform rigging duties. *Id.* Duplantis further
testified that the letter did not make sense to him because
Newfield had been requiring Lytal deckhands to perform rigging
duties "for almost a year then." *Id.* Duplantis stated that he
and Jim Zernell met with Lytal representatives in October 2005 to
discuss the safety issues. *Id.* at pp. 193-94. Duplantis
testified that, during this meeting, Newfield agreed not to ask
Lytal vessels to operate at night because of the danger posed by
unlit structures after Hurricane Katrina and Hurricane Rita, and
the parties discussed placing another deckhand on one of the
boats. *Id.* Duplantis also stated that there was no mention in
this October 2005 meeting of constant safety complaints against
Newfield. *Id.* Duplantis testified that he was in continuous
contact with Lytal representative Tommy Crosby during November
2005 and that he never received any complaint of a fundamental
safety issue. *Id.* at p. 196. Lytal withdrew its boats on
December 17, 2005. *Id.* at p. 200. From this evidence, and
testimony that charter rates increased after the hurricanes, *id.*
at pp. 321, 339, the jury could have concluded that Lytal's
safety concerns were merely a pretext in order to cancel the
contract and take advantage of the higher rates.

21

This evidence supports the jury's determination that any alleged breach by Newfield did not defeat the basic purpose or make it impossible for Lytal to perform the contract.  Whether or not they were required to under the contract, Lytal personnel had been performing rigging duties for almost a year before the allegations of breach surfaced.  After Lytal voiced concerns about its personnel being forced to perform rigging duties, Newfield agreed to provide its own personnel for rigging purposes.  Newfield's representatives were not made aware of any other serious safety issues, other than rigging and run-time, despite constant contact between Lytal and Newfield.  Further, the blanket time charter specifically provided a procedure for handling safety concerns.  The charter included a provision shifting the risk of loss to Newfield should Lytal vessels continue to operate over the express written objection of the captain.  Newfield was never made aware of any written reports of unsafe activity.  This suggests that Lytal's safety concerns would not render its performance of the contract impossible or defeat the central purpose of the contract, because the contract specifically spelled out a procedure for dealing with these concerns.  From this evidence, the jury could conclude that whatever alleged breaches of contract Newfield may have committed

were not sufficiently serious to constitute material breach of contract.  Thus, the evidence supports the verdict.

As to Lytal's contention that the jury was confused, Lytal does not demonstrate that the Court gave an erroneous instruction of law to the jury or that the jury misapplied the law to the facts of the case.  The Court instructed the jury as follows:

> LYTAL ARGUES THAT ITS OBLIGATION TO PROVIDE VESSELS TO NEWFIELD WAS EXCUSED BY NEWFIELD'S MATERIAL BREACH OF CONTRACT.  IF YOU FIND THAT NEWFIELD COMMITTED A MATERIAL BREACH OF THE BLANKET TIME CHARTER AND LETTER AGREEMENTS BETWEEN THE PARTIES, AND THAT THE BREACH OCCURRED BEFORE ANY ALLEGED BREACH BY LYTAL, THEN ANY FURTHER PERFORMANCE UNDER THE CONTRACT BY LYTAL WAS EXCUSED AND LYTAL DID NOT BREACH THE CONTRACT WHEN IT WITHDREW THE VESSELS.  LYTAL HAS THE BURDEN TO PROVE THIS DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.
>
> A MATERIAL BREACH OF CONTRACT IS THE FAILURE TO DO SOMETHING THAT IS SO FUNDAMENTAL TO THE CONTRACT THAT THE FAILURE TO PERFORM THAT OBLIGATION DEFEATS THE BASIC PURPOSE OF THE CONTRACT OR MAKES IT IMPOSSIBLE FOR THE OTHER PARTY TO PERFORM UNDER THE CONTRACT.  A BREACH IS MATERIAL IF A PARTY FAILS TO PERFORM A SUBSTANTIAL PART OF THE CONTRACT OR ONE OR MORE OF THE CONTRACT'S ESSENTIAL TERMS.  WHEN A PARTY COMMITS A MATERIAL BREACH OF CONTRACT, THE OTHER

PARTY IS EXCUSED FROM ITS OBLIGATION TO PERFORM UNDER
THE CONTRACT.

IN ORDER TO FIND THAT LYTAL'S PERFORMANCE WAS
EXCUSED BY A MATERIAL BREACH BY NEWFIELD, YOU MUST
FIND THAT LYTAL HAS PROVED EACH OF THE FOLLOWING BY A
PREPONDERANCE OF THE EVIDENCE:
(1) THAT NEWFIELD HAD AN OBLIGATION UNDER THE
CONTRACT;
(2) THAT NEWFIELD FAILED TO PERFORM ITS
OBLIGATION;
(3) THAT NEWFIELD'S FAILURE TO PERFORM TOOK
PLACE BEFORE LYTAL WITHDREW THE VESSELS;
(4) THAT ANY FAILURE TO PERFORM BY NEWFIELD WAS
MATERIAL.

IF YOU FIND THAT LYTAL COMMITTED A BREACH OF
CONTRACT THAT WAS NOT EXCUSED BY A PRIOR MATERIAL
BREACH BY NEWFIELD, THEN YOU MAY AWARD DAMAGES TO
NEWFIELD.

(R. Doc. 171 at pp. 9-11).  The Court offered this instruction
without objection.[1]  It is presumed that a jury acts in
accordance with the instructions given to it by the trial court.
*City of Los Angeles v. Heller*, 475 U.S. 796, 798 (1986).  The

---

[1] Lytal actually objected to the Court's failure to give a
material breach charge.  (Tr. Trans. at pp. 459-60).  When the
Court pointed out that there was a material breach charge in the
Court's draft jury instructions, Lytal did not object to the form
of the instruction.  *Id.*

instruction by the Court unambiguously establishes that, should the jury find that Newfield materially breached the contract before Lytal committed any alleged breach, then Lytal's performance was excused by a prior material breach.  The evidence supports the jury's conclusion that Lytal's performance was not excused by a prior material breach. Lytal argues that the jury was confused based on a written question the jury sent to the Court during deliberations: "Please provide a breakdown of both Parties' damage claims." (R. Doc. 170 at p. 4).  Without objection from the parties, the Court gave the following written response:

> IN ANSWER TO THE THIRD QUESTION, LYTAL DOES NOT HAVE A CLAIM FOR DAMAGES BEFORE YOU.  IT HAS ASSERTED THAT NEWFIELD BREACHED THE CONTRACT FIRST IN A MATERIAL WAY AS A DEFENSE TO NEWFIELD'S CLAIM THAT LYTAL BREACHED THE CONTRACT WHEN IT WITHDREW ITS VESSELS FROM NEWFIELD'S SERVICE.  I REFER YOU TO THE JURY CHARGES FROM PAGES 7 THROUGH 13.

(R. Doc. 170 at p. 5).  Thus, the jury was properly alerted that, should it find that Newfield committed a material breach of the contract, further performance by Lytal was excused and Lytal could not be liable for breach of contract.  The jury knew that any material breach by Newfield would excuse Lytal's performance and is presumed to follow the instructions it received from the Court.  In a verdict supported by the evidence, the jury clearly

25

found that Lytal's performance was not excused by a prior material breach.  The Court therefore finds no error.

### C.    Damages

Lytal next asserts three defects in the jury's damage calculation.  First, Lytal asserts that Newfield did not establish by competent evidence that it was entitled to anything but nominal damages.  Second, Lytal asserts that the jury disregarded the Court's instructions on calculating damages. Third, Lytal asserts that the evidence is insufficient to support reducing the jury's award of damages by remittitur.

As to Lytal's first argument, the Court finds that the evidence was sufficient to support an award of more than nominal damages.  On the first breach of contract claim, Glen Duplantis testified that, in each asserted instance of Lytal's vessels being out of operation, Newfield requested a replacement vessel. (Tr. Trans. at pp. 190-92, 194-95).  Duplantis further testified that Lytal did not provide a replacement vessel.  *Id.*  Duplantis established the length of time that each vessel was out of service: 65 days for the *Regan*, 8 days for the *Ashley*, and 14 days for the *Andre*.  *Id.*  Duplantis also testified that, although Newfield did not actually charter new vessels to take the place of the Lytal vessels, Newfield had to postpone other operations

26

in order to replace the absent vessels.  *Id.*  Duplantis testified
that the vessels that replaced the Lytal vessels cost Newfield
more than the day-rate charged by Lytal, but that he did not know
how much more it cost Newfield to operate without the Lytal
vessels.  *Id.*  Duplantis stated that Andy Lundy, a joint
operations engineer for Newfield, calculated the incremental
amount of damages suffered by Newfield.  *Id.*  Lundy later
testified as to the amount of damages he calculated, as the Court
discusses, *infra*.

Lytal also argues that it was entitled to a jury charge
indicating that Newfield had to prove that it was entitled to
more than nominal damages.  The Court instructed the jury as
follows:

> NEWFIELD IS ENTITLED TO RECOVER THE DAMAGES IT
> SUSTAINED IF LYTAL IS LIABLE FOR BREACH OF CONTRACT.
> YOU SHOULD CONSIDER THE CLAIMS AND ANY DAMAGE AWARDS
> SEPARATELY ACCORDING TO THESE INSTRUCTIONS.  NEWFIELD
> MUST PROVE ITS DAMAGES, IF ANY, BY A PREPONDERANCE OF
> THE EVIDENCE.
> YOU MUST AWARD THE AMOUNT YOU FIND BY A PREPONDERANCE
> OF THE EVIDENCE AS FULL AND JUST COMPENSATION FOR ALL
> OF NEWFIELD'S DAMAGES.  COMPENSATORY DAMAGES ARE NOT
> ALLOWED AS A PUNISHMENT AGAINST A PARTY.  SUCH

> DAMAGES CANNOT BE BASED ON SPECULATION, FOR IT IS
> ONLY ACTUAL DAMAGES – WHAT THE LAW CALLS COMPENSATORY
> DAMAGES – THAT ARE RECOVERABLE.   THEY ARE AN ATTEMPT
> TO PUT THE PLAINTIFF IN THE POSITION IT WOULD HAVE
> BEEN IN HAD THE CONTRACT BEEN PERFORMED.

(R. Doc. 171 at p. 12).  The instruction clearly establishes that Newfield has to prove damages, "if any," by a preponderance of the evidence.  As such, the jury was instructed that, should it find that Newfield did not prove its damages by a preponderance of the evidence, it did not have to award damages.  One of Lytal's defenses, which the jury clearly did not believe, was that Newfield did not suffer any damages as a result of Lytal's breaches of contract.  The jury was properly instructed as to Newfield's burden of proving damages, and the jury is presumed to follow the Court's instructions. *City of Los Angeles*, 475 U.S. at 798.  Lytal is not entitled to judgment as a matter of law or a new trial on this ground.

As to Lytal's second claim, Duplantis testified that Lytal withdrew its vessels on December 17, 2005.  *Id.* at p. 200.  As a result, Duplantis testified that Newfield had to shift vessels from other tasks and defer other work in order to replace the Lytal vessels.  *Id.* at pp. 200-03. Duplantis stated that Newfield was unable to find a vessel on the spot market to

28

replace the *Regan*.   Id.   He also testified that Newfield

eventually located two boats to take the place of the *Ashley*.

*Id.*  As with the first claim, Duplantis stated that he knew that

Newfield had incurred additional cost as a result of Lytal's

withdrawal of the vessels, but that Andy Lundy "took care of the

numbers." *Id.* at p. 203.

Andy Lundy testified that he was asked to calculate the cost

to Newfield of Lytal's withdrawal of its vessels and failure to

provide replacement vessels.  (Tr. Trans. at pp. 323-31).  Lundy

testified that one of his duties at Newfield was to analyze the

cost of vessel transportation to platforms in the Gulf.  *Id.* at

p. 314.  Lundy testified that he compared the actual cost of the

replacement vessels with an estimate of what the Lytal vessels

would have cost.[2]  *Id.*  Lundy calculated the cost of operating

the replacement vessels by reviewing the logs, fuel tickets, and

other documentation from those vessels.  *Id.* at p. 330.  Lundy

then prepared an estimate of what it would have cost to operate

the Lytal vessels, using the same per-gallon fuel costs and

---

[2] Lundy also prepared an assessment of the damages in the
form of a spreadsheet.  Although Newfield included a draft of the
assessment in the bench books it produced to the Court and to
Lytal, the draft in its bench books was not the draft it
attempted to enter into evidence.  For this reason, Newfield
withdrew the exhibit and Lundy testified directly as to the
amount of damages he calculated.  (Tr. Trans. at pp. 331-43).

estimating the vessels' run-time based on comparison with a previous three-month period. *Id.* Lundy testified that he performed this analysis for both Lytal's failure to provide replacement vessels and the withdrawal of the vessels. *Id.* at p. 331. Lundy also explained the specific issues he confronted in calculating the incremental cost of each replacement vessel. *Id.* at pp. 338-42. Lundy described how he calculated damages when a Lytal vessel was replaced by a single vessel, and when another Lytal vessel was replaced by four different vessels. *Id.* On cross-examination, he stated that, as a usual part of his business, he analyzes what it costs Newfield to have a vessel out of service. *Id.* at p. 343. Lundy testified that, after calculating the incremental cost according to the methodology he spelled out, he determined that the withdrawal of the *Regan* and the *Ashley* in December 2005 cost Newfield about $540,000. *Id.* at p. 341. He further testified that he determined that Lytal's failure to provide substitute vessels to Newfield while the *Regan*, *Ashley*, and *Andre* were out of service cost Newfield about $148,000. *Id.* at p. 342.

This testimony is sufficient to support an award of damages. Lundy testified in detail about his process of reviewing daily invoices to determine the additional cost to Newfield of Lytal's two breaches of the charter agreement. Counsel for Lytal cross-

examined Lundy's calculations in an attempt to demonstrate that
Newfield in fact suffered no damages.  Lundy disagreed with
counsel's contention that Newfield saved money because of Lytal's
breach.  The jury was entitled to believe Lundy.  That Lundy's
testimony may not represent a to-the-penny calculation of
Newfield's damages is immaterial:

> [Plaintiffs] are required to prove their right to
> damages to a certainty, but damages are not rendered
> uncertain because they cannot be calculated with
> absolute exactness.  It is sufficient that there be
> proved a reasonable basis of computation, although
> the result may be only approximate.  A defendant
> whose wrongful act creates the difficulty is not
> entitled to complain that the amount of the damages
> cannot be accurately fixed.

*Austin v. Parker*, 672 F.2d 508, 522 (5th Cir. 1982) (quoting
*Ryneld v. Dupuis*, 39 F.2d 399, 400 (5th Cir. 1930)).  The Court
finds that the evidence supports an award of damages greater than
nominal damages.

The Court does, however, find that the evidence was
insufficient to support the amount of the jury's award as to
Newfield's two breach of contract claims.  Although the jury's
assessment of damages is generally entitled to great deference,
remittitur may be appropriate when the award "clearly exceeds
that amount [to which] any reasonable man could feel the claimant
is entitled." *Enterprise Refining Co. v. Sector Refining, Inc.*,
781 F.2d 1116, 1118 (5th Cir. 1986) (citations and internal

31

punctuation omitted).  Under such circumstances, the Court should remit the jury's award to the maximum amount the jury properly could have awarded.  *Id.*

On Newfield's first claim, the jury awarded $231,675.00. This amount is not supported by the evidence or the Court's charge to the jury.  The Court instructed the jury that Newfield's damages were as follows:

> (1) THE TOTAL VALUE OF THE PERFORMANCE THAT NEWFIELD DID NOT RECEIVE BECAUSE OF LYTAL'S FAILURE; PLUS
> (2) ANY OTHER LOSS TO NEWFIELD CAUSED BY LYTAL'S FAILURE TO PERFORM; MINUS
> (3) THE TOTAL AMOUNT THAT NEWFIELD AVOIDED HAVING TO SPEND BECAUSE IT DID NOT HAVE TO PERFORM.  LYTAL'S DAMAGES FOR NEWFIELD'S FAILURE TO PAY INVOICES IS NOT AN ISSUE BEFORE YOU AND YOU SHOULD NOT REDUCE ANY AWARD TO NEWFIELD FOR THE AMOUNT OF THESE INVOICES.

(R. Doc. 171 at pp. 12-13).  The amount the jury awarded Newfield corresponds to the entire amount it would have paid Lytal for the vessels.  The evidence introduced by Andy Lundy, who testified as to the method by which he calculated the amount of damages suffered by Newfield as a result of Lytal's breach, establishes that the maximum award of damages is $148,000.  Lundy testified at length about his calculation of damages, which was in

accordance with the Court's instruction on damages.  The jury
award clearly exceeded Newfield's damages and was unsupported by
the evidence.  Accordingly, the Court will grant Lytal a new
trial, as to damages only, unless Newfield agrees to accept a
remittitur of the judgment on this claim to the amount of
$148,000.

     As to Lytal's second breach of contract claim, the jury
awarded $600,875.00.  Again, this corresponds to the total amount
that Newfield would have had to pay Lytal for the use of its
vessels after Lytal withdrew them.  The evidence introduced by
Andy Lundy, who testified that he calculated the damages in
accordance with the Court's instruction on damages, establishes
that the maximum award of damages is $540,000.  The jury award
clearly exceeded the damages proved by Newfield.  Accordingly,
the Court will grant Lytal a new trial, as to damages only,
unless Newfield agrees to accept a remittitur of the judgment on
this claim to the amount of $540,000.


     **D.   Indemnity Obligation**

     Finally, Lytal argues that the calculation of pre-judgment
interest on Newfield's contractual indemnity claim should not
begin until the date that Newfield actually paid for the repairs.
Because the motion does not address the basis for the jury's

                               33

verdict but the Court's determination of prejudgment interest as
a matter of law, the Court will treat the motion as a motion to
alter or amend the judgment under Fed. R. Civ. P. 59(e).  In
maritime cases, "[t]he award of pre-judgment interest is the rule
rather than the exception." *Todd Shipyards Corp. v. Turbine
Service, Inc.*, 674 F.2d 401, 415 (5th Cir. 1982) (citation
omitted).  Interest is awarded "as compensation for the use of
funds to which the claimant is rightfully entitled." *Id.*

Lytal asserts that "[t]he general rule of indemnity provides
that a cause of action does not arise until there is a
determination of initial liability." *Hercules, Inc. v. Stevens
Shipping Co., Inc.*, 698 F.2d 726, 733 (5th Cir. 1983).  Put
another way, "[t]he cause of action for indemnity arises only
upon payment or settlement by the indemnitee." *See* Thomas J.
Schoenbaum, 1 *Admiralty & Maritime Law* § 5-20 (4th ed. 2007).
Therefore, Lytal could not be liable to Newfield for contractual
indemnity until Newfield paid to repair its platform.  The cases
cited by Newfield in its opposition to Lytal's motion are
inapposite: they address repair costs for maritime torts.  *See
Ryan Walsh Stevedoring Co., Inc. v. James Marine Services, Inc.*,
792 F.2d 489, 493 (5th Cir. 1986) (citations omitted).  But in
the case of a maritime tort, the cause of action accrues upon the
occurrence of the tort, not upon payment.  Had Newfield

established Lytal's liability for the damage to the platform as a
maritime tort, prejudgment interest would run from the date of
the accident.  Because the obligation arose only upon payment for
the repairs, prejudgment interest runs from the date of payment.
Accordingly, Lytal is entitled to alteration of the judgment to
reflect that prejudgment interest should run from June 1, 2006.


V.   **CONCLUSION**

For the foregoing reasons, the motion for judgment as a
matter of law is DENIED.  The motion for a new trial is DENIED IN
PART and GRANTED IN PART, unless Newfield agrees to accept a
remittitur of the judgment in accordance with this opinion.  The
motion to alter or amend the judgment is GRANTED, and the Court
will enter a new judgment on the indemnification claim pending
Newfield's response to the Court's remittitur.



New Orleans, Louisiana, this __27th__ day of April, 2007.



_Sarah Vance_
_____
       SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

35